United States District Court
Southern District of Texas
**ENTERED**
March 09, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **PITTSBURGH LOGISTICS SYSTEMS, INC,** | § § § | |
| **Plaintiff,** | § § | |
| **VS.** | § § | **CIVIL ACTION NO. 4:20-CV-04282** |
| **ANDREW BARRICKS,** | § § | |
| **Defendant.** | § § | |

## MEMORANDUM & ORDER

On March 7, 2022, the Court held a hearing on the parties' cross-Motions for Summary Judgment. For the reasons stated on the record, the Court DECLINED to strike Defendant's affidavit under the sham affidavit doctrine and GRANTED summary judgment to Defendant on the Computer Fraud and Abuse Act claim. It took the remaining claims under advisement. The Court now provides its ruling on those remaining claims.

### I.  BACKGROUND

Plaintiff Pittsburgh Logistics Systems, Inc. ("PLS") is a third-party logistics services company, coordinating transportation of freight between customers and carriers.

PLS alleges that its primary asset is its customer information. Thus, this customer information is maintained in strict confidentiality, internally and externally. PLS's customer names are generally unknown outside of the company, PLS does not publish its customer names, and PLS's customer names are not otherwise publicly available.

Defendant Andrew Barricks began working at PLS in 2012. Mr. Barricks' position included cultivating and maintaining customer relationships, with the goal of offering services to

those customers. He used his company-issued laptop to communicate with customers throughout the United States for the purpose of engaging those customers to coordinate the pickup and drop-off of goods. PLS paid Mr. Barricks throughout his employment in accordance with the Employment Agreement between the parties.

Per his 2016 Employment Agreement with PLS, Mr. Barricks was subject to non-solicitation provisions that extended two years after the termination of his employment with PLS for any reason. (Def.'s Appx005). He was also subject to non-competition provisions that extended one year after the termination of his employment with PLS for any reason. (Def.'s Appx006). The non-solicitation provisions state:

> **7. Non-Solicitation.** *For a period of 2 years after the termination of my employment, for any reason, I agree not to directly or indirectly, anywhere in the United States, offer or attempt to offer any Prohibited Services (as defined herein) to any Restricted Customers (as defined herein) without first obtaining the Company's written approval. For purposes of this Agreement: (a) the term "Prohibited Services" means: (i) transportation management services, including outsourced transport, freight brokerage or logistics services, whether internet based or otherwise; (ii) developing and providing an e-commerce web site for providing logistic services for use by shippers or carriers; (iii) export and import services, including trans-border logistics, ocean container, break-bulk, and consulting; (iv) transportation related technical publications and services; (v) any other services that are the same as or similar to the services offered by the Company; and (vi) any services that were not yet offered, but were being developed, by the Company within the last year prior to the termination of my employment with the Company; and (b) the term "Restricted Customers" means those customers that I have solicited or helped to solicit for the Company, or to which I have provided services or helped to provide services for the Company, as well as those customers about which I received confidential information during my employment with the Company that might be useful in making such a solicitation, whether they are the Company's current or former customers. In connection with this obligation, I expressly, and irrevocably, agree and represent that the scope of this non-solicitation obligation, including the temporal, geographic, and activity scope, is neither onerous nor overly broad, and is, instead, both reasonable and necessary to protect the Company's legitimate business interests. With particular respect to the geographic scope of this non-solicitation obligation, I expressly, and irrevocably, agree and represent that a nationwide scope is reasonable and necessary because,* inter alia*, the customers with which I will interact, and about which I will obtain information, are located and do business throughout the United States. I further expressly, and irrevocably, agree and represent that: (a) I can, and will, seek written approval from the Company to offer Prohibited Services to a Restricted Customer whenever this non-*

*solicitation obligation creates, in my opinion, a restriction that is onerous or overly broad, or that is not reasonable and necessary to protect the Company's legitimate business interests; (b) such an approval process is a reasonable and appropriate method for me to seek such relief under such circumstances; and (c) my failure to seek such approval should be deemed to be an admission by me that the non-solicitation obligation is neither onerous nor overly broad, and is, instead, both reasonable and necessary to protect the Company's legitimate business interests.*

(Def.'s Appx004-005.)

The non-competition provisions, with similar language, state:

**8. *Non-Competition.*** *For a period of 1 year after the termination of my employment, for any reason, I agree not to directly or indirectly, anywhere in the United States, become an officer or director of, a consultant to, be employed by, or otherwise render services to, or on behalf of, a Competing Business (as defined herein) without first obtaining the Company's written approval. For purposes of this Agreement, the term "Competing Business" shall mean any person, corporation, partnership, joint venture, association or other entity engaged in the business of offering or attempting to offer any Prohibited Services (as defined in Section 7). In connection with this obligation, I expressly, and irrevocably, agree and represent that the scope of this noncompetition obligation, including the temporal, geographic, and activity scope, is neither onerous nor overly broad, and is, instead, both reasonable and necessary to protect the Company's legitimate business interests. With particular respect to the geographic scope of this non-competition obligation, 1 expressly, and irrevocably, agree and represent that a nationwide scope is reasonable and necessary because,* inter alia*, the customers with which I will interact, and about which I will obtain information, are located and do business throughout the United States. I further expressly, and irrevocably, agree and represent that: (a) I can, and will, seek written approval from the Company to engage in Prohibited Services whenever this non-competition obligation creates, in my opinion, a restriction that is onerous or overly broad, or that is not reasonable and necessary to protect the Company's legitimate business interests; (b) such an approval process is a reasonable and appropriate method for me to seek such relief under such circumstances; and (c) my failure to seek such approval should be deemed to be an admission by me that the non-competition obligation is neither onerous nor overly broad, and is, instead, both reasonable and necessary to protect the Company's legitimate business interests.*

(Def.'s Appx005.)

Additionally, the Employment Agreement included confidentiality provisions, which state:

**4. *Confidentiality.*** *During the term of my employment with the Company and at all times thereafter, I shall not, directly or indirectly, divulge, furnish or make accessible to any other person, business, firm or corporation, or use in any way other than for the benefit*

*of the business of the Company, any Confidential Information (as defined herein) which I have acquired or become acquainted with or will acquire or become acquainted with as a result of my employment with the Company, whether developed by me, or by others. For purposes of this Agreement: (a) Confidential Information shall mean any proprietary or confidential information of the Company, including but not limited to any trade secrets, confidential or secret designs, website technologies, content, processes, fonnulae, plans, manuals, devices, machines, knowhow, methods, compositions, ideas, improvements, financial and marketing information, costs, pricing, sales, sales volume, methods and proposals, customer and prospective customer lists, identity of key personnel in the employ of customers and prospective customers, amount or kind of customer's purchases from the Company, system documentation, hardware, engineering and configuration information, computer programs, source and object codes (whether or not patented, patentable, copyrighted or copyrightable), related software development information, inventions or other confidential or proprietary information belonging to the Company or directly or indirectly relating to the Company's business and affairs. The Confidential Information is the property of the Company and I acknowledge that the use, misappropriation or disclosure of the Confidential Information would constitute a breach of trust, fiduciary duty and could cause irreparable injury to the Company. Furthermore, I acknowledge and agree that during the course of my employment with the Company, I may be exposed to the confidential information of customers and other third parties and I will maintain the confidentiality of this information and will only use it as necessary to carry out the work for the Company consistent with the Company's arrangement with these customers and third parties. Nothing contained herein shall restrict my use of general knowledge acquired by me as part of my normal growth in my profession.*

(Def.'s Appx 003.)

The Employment Agreement additionally included a provision regarding return of company information, whereby Mr. Barricks agreed to return any Company-owned property and records in his possession to PLS at the time of termination from PLS for any reason. (Def.'s Appx 004.) This provision expressly defined such property as including customer lists and other Confidential Information or reproductions of same. (*Id.*)

On March 9, 2020, Mr. Barricks accepted an offer of employment with Glen Rose Transportation Management ("GRTM"). GRTM is a third-party logistics services company, specializing in refrigerated freight. PLS and GRTM are competitors in the third-party logistics services industry.

Plaintiff alleges the following:

- On April 9, 2020, Mr. Barricks used his PLS-issued computer to send an e-mail to his personal e-mail account (abarricks13@gmail) from his PLS e-mail account abarricks@plslogistics.com) that contained, among other things, a document entitled "AJ Lifetime Number 8.14.19." The document contained the names of PLS's customers who had worked with Mr. Barricks and included the numbers of loads, total revenue, total cost, margin, and margin percentage. (Pl.'s Appx044-49). It included information for the following customers: Satellite Logistics Group (also known as Hillebrand) (Pl.'s Appx049); Novvi, LLC (Pl.'s Appx047-048); Select Energy Services (Pl.'s Appx046); Foeder Crafters of America (Pl.'s Appx048-049); Professional Plastics (Pl.'s Appx046-40); and Titan Containers (Pl.'s Appx047- 48). PLS had continuing business relationships with all six companies at the time (April 2020 and earlier).

- On April 9, 2020, Mr. Barricks resigned from his position as a Senior Account Executive with PLS, offering to "help with transitions" through April 14, 2020. (Exhibit 7, Pl.'s Appx052, email thread, Subject: AJ Barricks Resignation, dated April 2020). In his exit interview with PLS, completed April 16, 2020, Mr. Barricks lists his last day worked as April 14, 2020. (Exhibit 10, Pl.'s Appx080, Andrew Barricks' Exit Interview).

- On April 10, 2020, Mr. Barricks began working for GRTM as a Sales Manager (Pl.'s Appx025, Appx028). On the same day, Mr. Barricks sent an e-mail from his PLS e-mail account (abarricks@plslogistics.com) to his GRTM e-mail account (ajbarricks@grtminc.com). (Exhibit 8, Pl.'s Appx056, e-mail from Mr. Barricks, dated April 10, 2020).

- Also on April 10, while still technically employed by PLS, Mr. Barricks corresponded with PLS's Restricted Customers. (Exhibit 9, Pl.'s Appx067, Barricks' First Supplemental Response to Plaintiff's First Set of Interrogatories, dated October 6, 2021). In response to Interrogatory Number 6, Mr. Barricks answered that the "First Time of Contact after Employed at Glen Rose" for Hillebrand, Novvi, LLC, Foeder Crafters, Professional Plastics, and Titan Containers was April 10, 2020. (Pl.'s Appx067).

- As early as April 13, 2020, Mr. Barricks officially engaged former PLS customers, with Mr. Barricks servicing the accounts on behalf of GRTM. (Exhibit 11, Pl.'s Appx129, 136 (Brokerage Revenue Reports showing April 2020 ship dates for Novvi, LLC and an April 13, 2020, ship date for Professional Plastics)). Mr. Barricks has conducted business with at least the six above-listed former customers of PLS. (Pl.'s Appx30). Mr. Barricks did not seek permission from PLS to offer Prohibited Services to Restricted Customers.

In an affidavit, Defendant Barricks adds details surrounding the above events. Having declined to strike his affidavit under the sham affidavit doctrine, as Plaintiff requested, the Court will consider his allegations set forth below:

- Mr. Barricks left PLS due to a change in employment duties that caused him to have to work longer hours for the same or less money. (Exhibit "D", Def.'s APPX 016-019, Barricks Declaration, ¶ 6.)

- Mr. Barricks denies receiving any specialized training or information from Plaintiff PLS. *(Id.,* ¶ 3.) He contends he was never provided a book of business from Plaintiff and gained all his client contacts from cold calling or from personal relationships he had prior to working for Plaintiff. *(Id.,* ¶¶ 2, 3, 11.) He created the customer list at issue himself on August 14, 2019, long before he resigned from PLS. *(Id.;* ECF No. 1, PJ's Orig.

Complaint, Sealed Exhibit A-1.) Defendant created this list for purposes of self-evaluation and self-monitoring because Plaintiff failed to conduct performance reviews or otherwise instruct him on how to perform his job. (*Id.* ¶ 8.) Defendant told Plaintiff during his exit interview on April 16, 2020, about the lack of training and poor management oversight. (Exhibit "C," Pl.'s APPX 011-015, Exit Interview.)

- Defendant did not rely upon the customer list at issue or any training from Plaintiff for any sales he made at PLS. (Exhibit "D," Def.'s APPX 016-019, ¶¶ 9-10.) Defendant relied upon his own attributes and phone calls to sell to clients. (*Id.*, ¶¶ 2-3). No other managers or salespeople at PLS used "AJ Lifetime Number 8.14.19". (*Id.*, ¶¶ 9-10). Defendant did not use "AJ Lifetime Number 8.14.19" after resigning from PLS. (*Id.*)

- The email attached to Plaintiffs Original Complaint has 249 attachments, only one of which is the customer list in question. The remaining attachments are of a personal nature. (*Id.*, ¶ 8.) Plaintiff has had access to this email, and its attachments, since the date of the email on April 9, 2020, yet has only pointed to the customer list as an alleged trade secret or confidential information.

- Mr. Barricks' act of emailing the customer list to himself was an accident. (*Id.*) He had accidentally placed this list in his "personal" folder on his company laptop. (*Id.*) His "personal" and "business" folders are right next to each other on his laptop, and he accidentally dragged this list into his personal folder and emailed it along with his personal documents during his last week of employment, when he knew he was leaving PLS. (*Id.*)

- Though Mr. Barricks acknowledges that he left PLS and began working for GRTM, he contends that he directed all his clients back to Plaintiff and provided each of them

information as to which of PLS's representatives would take over their accounts. *(Id.,* ¶ 13.) Defendant sent an email to his supervisor in his last week of employment in which he informed his supervisor of his resignation and provided his complete book of business and all information related to his customers. *(Id.,* ¶ 3.) (Exhibit "B," Def.'s APPX 008-010, Barricks Resignation Email.)

- Mr. Barricks denies, after leaving PLS, ever soliciting the business of any of his former customers. (See Exhibit "D," Def.'s APPX 016-019, ¶ 13.) The customer list in question has the names of approximately 250 customers serviced by Defendant while employed by Plaintiff. (Exhibit "D," Def.'s APPX 016-019, ¶ 11.) However, Defendant only serviced six of those customers after leaving PLS. One of those customers is a company where his father is an executive; Defendant obtained that client through his connection with his father. (*Id.*) As to the other five companies, all of them initiated contact with Defendant regarding business with GRTM; they asked him if he would continue to do business with him. (*Id.*) Defendant maintains that this short list of customer names was not gained through any customer list.

Between April 2020 to August 31, 2021, GRTM obtained $925,663.04 in gross revenue ($196,779.21 in gross margins) from those customers. (Exhibit 4, Appx029-30, Income and Expenses Chart). Mr. Barricks' gross compensation from April 2020 to August 31, 2021, at GRTM was $196,261.52. (Pl.'s Appx030)

On December 16, 2020, PLS filed an Original Complaint, which is the live pleading. Defendant filed an Original Answer denying Plaintiff's allegations and counterclaiming for attorney's fees under the Texas Covenant Not to Compete Act.

## II.      MOTIONS FOR SUMMARY JUDGMENT

### A.  Threshold Issues

The parties each raise threshold issues. During the hearing, the Court declined to strike Defendant's affidavit under the sham affidavit doctrine. Any contentions about the credibility of Defendant's evidence will be decided at trial.

The Court, however, has yet to rule on Mr. Barricks' argument that the Texas Covenant Not to Compete Act ("CNCA") bars PLS's breach of contract claims, to the extent they rely on his alleged violation of the non-competition and non-solicitation terms of his Employment Agreement. Defendant further argues that all claims other than those under the CNCA should be dismissed.

Non-competition covenants are generally enforceable under Texas law pursuant to Tex. Bus. & Comm. Code § 15.50(a) when they are reasonable and ancillary to or part of an otherwise enforceable agreement. Moreover, Tex. Bus. & Comm. Code § 15.52 states:

> *The criteria for enforceability of a covenant not to compete provided by Section 15.50 of this code and the procedures and remedies in an action to enforce a covenant not to compete provided by Section 15.51 of this code are exclusive and <u>preempt any other criteria for enforceability of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise</u>.*

(Emphasis added.) The Court agrees with Plaintiff's assertion that the preemption provision limits preemption to "any other criteria for enforceability of a covenant not to compete."

Further, Plaintiff argues that its causes of action are not based on Defendant's breach of the non-competition or non-solicitation provisions of his Employment Agreement. Instead, Plaintiff asserts, they hinge on Defendant's alleged intentional taking of confidential information in breach of his Employment Agreement, using that information for his own benefit and that of a

direct industry competitor, and failing to return the confidential information to Plaintiff. The Court finds this argument convincing, at least as to whether the CNCA bars all other claims.

Having concluded that the Texas Covenant Not to Compete Act does not bar other claims—apart from some breach of contract claims, as discussed below—the Court examines the merits of Plaintiff's claims.

### B. Computer Fraud and Abuse Act

The Court GRANTED summary judgment to Defendant on Plaintiff's Computer Fraud and Abuse Act claim during the hearing. The Court does not review its reasoning here.

### C. Breach of Contract

Plaintiff argues that Defendant Barricks breached the provisions of the Employment Agreement relating to non-solicitation, confidentiality, and the return of company information. Plaintiff also alleged a breach of the non-compete terms in its Complaint but does not raise the issue in its summary judgment motion; Defendant, on the other hand, seeks summary judgment as to the non-competition provisions, along with the other breach of contract allegations. The Court addresses these provisions within the Employment Agreement signed in 2016, the one effective at the time of Mr. Barricks' termination.

To establish a claim for breach of contract, a plaintiff must establish (1) there is a valid, enforceable contract; (2) the plaintiff is the proper party to bring a breach of contract action; (3) the plaintiff performed, tendered performance of, or was excused from performing its contractual obligations; (4) the defendant breached the contract; and (5) the defendant's breach caused plaintiff's injury. *McAllen Hosps., L.P. v. Lopez,* 576 S.W.3d 389, 392 (Tex. 2019) (element l); *Zuniga v. Wooster Ladder Co.,* 119 S.W.3d 856, 862 (Tex. App.—San Antonio 2003, no pet.)

(element 2); *Marquis Acquisitions, Inc. v. Steadfast Ins.,* 409 S.W.3d 808, 813 (Tex. App.—Dallas 2013, no pet.) (elements 1, 3-5).

Defendant argues that the non-compete and non-solicitation provisions are unreasonable in time period and scope and are therefore unenforceable under the CNCA. The Court applies the Texas Covenant Not to Compete Act to determine the enforceability of these terms. The CNCA explicitly governs this determination as to the non-competition provisions. *See* Tex. Bus. & Comm. Code § 15.52. Regarding the latter, the CNCA "does not, on its face, apply to non-solicitation agreements." *Shoreline Gas, Inc. v. McGaughey*, 2008 WL 1747624, at *9 (Tex.App. – Corpus Christi, 2008). But "covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the [CNCA]." *Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) (citing *DeSantis v. Wackenhut Corp*., 793 S.W.2d 670, 681-682 (Tex. 1990); *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 599-600 (Tex.App. – Amarillo 1995, no writ) (stating that non-solicitation covenants prevent the employee from soliciting customers of the employer and effectively restrict competition); *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 464-65 (5th Cir. 2003) (applying Texas law and stating that non-solicitation covenants restrain trade and competition and are governed by the Act); *Rimkus Consulting Group, Inc. v Cammarata*, 255 F.R.D. 417, 438-39 (S.D. Texas 2008) (holding that a "nonsolicitation covenant is also a restraint on trade and competition and must meet the criteria of section 15.50 of the Texas Business and Commerce Code to be enforceable" (citations omitted)). The non-solicitation agreement in this case places limits on the Defendant's professional mobility and further restricts his solicitation of the Plaintiff's customers. Thus, the non-solicitation terms constitute a restraint on trade governed by the CNCA.

### i.   Time Period of Non-Competition and Non-Solicitation Terms

The Court is unconvinced by Defendant's argument that the time period of the terms is unreasonable. Section 9 of the Employment Agreement merely extends the time period during which the provisions apply "by that number of days which equals the aggregate of all days during which any such violations occurred." (Def.'s Appx 006.) That is, an extension is relevant only when an employee begins violating one of the provisions during the applicable period and continues thereafter. It does not indefinitely extend the time period in all instances, as Defendant suggests.

### ii.   Scope of Non-Competition Terms

Defendant also argues that the non-compete and non-solicitation provisions are unreasonable in scope.

The Court first addresses whether the non-compete terms are unreasonable in scope. "Texas courts note that non-compete covenants that contain either an industry wide exclusion from subsequent employment and/or that prevent contact with clients with whom the employee had no contact are unenforceable." *Trans Perfect Translations, Inc v. Leslie*, 594 F.Supp.2d 742, 754 (S.D. Texas 2009) (citing *Peat Marwick Main & Co v. Haass*, 818 S.W.2d 381, 386-387 (Tex. 1991)).

Defendant argues that the non-competition agreement does not limit itself to a particular set of customers, a particular company, or a particular set of circumstances. Instead, Defendant argues, it is an industry wide ban throughout the United States. The above provision is analogous to the provision in *Stroman*, which the court found to be unreasonable and unenforceable. *John R Ray & Sons, Inc v. Stroman*, 923 S.W.2d 80, 85 (Tex.App. - Houston [14th] 1996). There, insurance salesman Robert Michael Stroman signed a non-compete agreement barring him from

working in the insurance industry within Harris County or adjacent counties for a period of five

years if he left his employer. *Id*. at 83. Affirming the trial court's granting of summary judgment

for Stroman, the Court of Appeals found that provision to be an unreasonable and unenforceable

industry wide ban on employment. *Id*. at 85.

      Here, the Court finds that the non-competition provisions, in conjunction with the

definitions of "Competing Business" and "Prohibited Services," amount to a ban on employment

with a competitor performing any of the following *anywhere in the United States*: "(i)

transportation management services, including outsourced transport, freight brokerage or

logistics services, whether internet based or otherwise; (ii) developing and providing an e-

commerce website for providing logistic services for use by shippers or carriers; (iii) export and

import services, including trans-border logistics, ocean container, break-bulk and consulting; (iv)

transportation related technical publications and services; (v) any other services that are the same

as or similar to the services offered by the Company; and (vi) any services that were not yet

offered, but were being developed by the Company within the last year prior to the termination

of my employment with the Company." The Court concludes that these non-competition terms

are unreasonable in scope, as they amount to "an industry wide exclusion from subsequent

employment." *Trans Perfect Translations*, 594 F.Supp.2d at 754 (citing *Peat Marwick Main*, 818

S.W.2d at 386-38).

      Thus, the Court GRANTS summary judgment to the Defendant on the breach of contract

cause of action *as to* alleged breach of the non-competition provisions. This ruling does not

apply to Plaintiff's other breach of contract claims, discussed below.

### iii.    Scope and Alleged Violation of Non-Solicitation Terms

The Court next addresses whether the non-solicitation terms are unreasonable in scope. Those terms apply only to "Restricted Customers," which are defined as: "customers that I have solicited or helped to solicit for the Company, or to which I have provided services or helped to provide services for the Company, as well as those customers about which I received confidential information during my employment with the Company that might be useful in making such a solicitation, whether they are the Company's current or former customers." The Court disagrees with Defendant's argument that the non-solicitation provisions prohibit him from doing business with clients with whom he has had no prior contact. *Cf. Marsh*, 354 S.W.3d at 768. It thus finds that the non-solicitation terms are *not* unreasonable in scope.

Defendant also contends (1) that he did not receive fair notice of the non-solicitation claim and (2) that he did not receive consideration for signing the non-solicitation agreement, rendering it invalid. These arguments are unavailing. First, Plaintiff explicitly stated allegations relating to the non-solicitation agreement (Section 7) and incorporated those allegations in the breach of contract cause of action. *See*, *e.g.*, Doc. 1, ¶¶ 30, 62.

Second, Plaintiff argues that access to PLS' confidential information satisfies the consideration element. In *Fielding*, the Texas Supreme Court held that even an employee's promise not to disclose confidential information in the absence of an express promise by the employer to furnish such information is sufficient to render an agreement enforceable. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 851 (Tex. 2009) (cited in *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 852 (W.D. Tex. 2016)). Further, even if an implied promise to provide an employee with confidential is illusory, parties form an 'otherwise enforceable agreement'" when the employer "perform[s] its illusory promise by actually

14 / 21

providing the confidential information." *Id.* Here, there is no genuine dispute that Defendant had access to customer identities, customer contacts responsible for the shipment of certain freight, industry segments in which customers operate, contract terms, pricing, and other financial parameters and time constraints for customers' freight; these, among other items, are defined as confidential information in the Employment Agreement. In any event, the Texas Supreme Court has admonished that "[t]he enforceability of [a] covenant should not be decided on 'overly technical disputes' of defining whether the covenant is ancillary to an agreement," *Marsh*, 354 S.W.3d at 777, as Plaintiff attempts to do here. Instead, the Texas Supreme Court has determined that the core inquiry is that of the second major factor in § 15.50(a)—whether the restrictions are reasonable and do not impose a greater restraint than necessary to protect the goodwill or other business interest of the promise. *Id.*; *see also Alex Sheshunoff Management Services LP v. Johnson*, 209 S.W.3d 644, 655 (Tex. 2006). The Court completed this inquiry above. For these reasons, Defendant's argument that the non-solicitation provision is unenforceable for lack of consideration must fail.

Because the Court finds that the non-solicitation provisions are enforceable, it proceeds to analyze whether Defendant breached them, as Plaintiff alleges. Under Section 7, Defendant "agree[d] not to directly or indirectly, anywhere in the United States, offer or attempt to offer any Prohibited Services (as defined herein) to any Restricted Customers (as defined herein) without first obtaining the Company's written approval." (Def.'s Appx 004.) It is undisputed that Plaintiff offered and provided services to at least six of Plaintiff's customers within the applicable period, and that he did not obtain Plaintiff's written approval to do so. The Court therefore concludes that Defendant breached the non-solicitation terms.

15 / 21

Defendant does not contest Plaintiff's arguments as to the other elements of its claim that Defendant breached the non-solicitation agreement.

Based on the above, the Court GRANTS summary judgment to the Plaintiff on the breach of contract cause of action *as to* breach of the non-solicitation provisions.

### iv.    Confidentiality Provision

As to the confidentiality provision, there is a genuine dispute of material fact whether Defendant divulged any confidential information to GRTM in violation of the provision. For instance, Plaintiff states in his affidavit: "[T]o the extent that there was some type of confidential or proprietary information provided to me by PLS, I never provided used *[sic]* any such information and never provided any such information to Glen Rose Transportation." (Exhibit "D", Def.'s APPX 016-019, Barricks Declaration, ¶ 6.)

Therefore, the Court DENIES summary judgment on the issue whether Defendant breached the confidentiality provision.

### v.    Return of Materials Provision

Finally, with respect to the return of materials provision, the Court agrees with Defendant that he did not receive fair notice of the claim. Plaintiff does not contest Defendant's assertion that the provision was first mentioned in Plaintiff's Motion for Summary Judgment. Instead, it counters that Defendant has had a copy of the 2016 Employment Agreement and should have returned the materials, at least since this suit was initiated. Each party makes valid points.

Thus, the Court GRANTS Plaintiff leave to amend its complaint, within five days of this Order, to add allegations relating to the return of materials.

### D.  Trade Secrets: Defend Trade Secrets Act and Misappropriation of Trade Secrets Under Texas Uniform Trade Secrets Act

Plaintiff seeks summary judgment as to its trade secrets claims under the federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act ("TUTSA").

The elements for a claim under the Defend Trade Secrets Act are: (1) Plaintiff owns a trade secret; (2) the trade secret was misappropriated; and (3) the misappropriated trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. *See* 18 USC §1836(b). The issue whether something is a trade secret is typically a fact issue. *Tewari De-Ox Systems, Inc v Mountain States/Rosen, LLC*, 637 F.3d 604, 613 (5th Cir. 2011) ("In many cases, the question of whether certain information constitutes a trade secret ordinarily is best 'resolved by a fact finder after full presentation of evidence from each side.'") (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978)). As to the second element, the Courts have examined whether "use" is required to establish a Defend Trade Secret Act case. In *M-1,* the court found that the Defend Trade Secrets Act require the proof of the same elements as the Texas Uniform Trade Secret Act and that both statutes require "use" of the trade secret. *M-I L.L.C. v. Q'Max Sols., Inc.*, No. CV H-18-1099, 2019 WL 3565104, at *4 (S.D. Tex. Aug. 6, 2019).

Similarly, to establish a misappropriation of trade secrets claim under TUTSA, a plaintiff must show "(1) the existence of a trade secret; (2) a breach of a confidential relationship; (3) the defendant used or disclosed the trade secret; and (4) it suffered injury as a result." *IKON Office Solutions, Inc. v. Furnish*, 2007 WL 9702416 (W.D. Tex. 2007) (citing *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003)). Because it does not normally rise to the stature of the type of information afforded "secrecy," customer information gleaned through

general investigation and experience with a client is not normally given trade secret status. *Id. at *19* (citing *Guy Carpenter & Co.*, 334 F.3d at 467); *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.2d 452, 467 (Tex. App.—Austin 2004, pet. denied). "Consistent with this concept of secrecy, a former employee may use the general knowledge, skills and experience acquired during employment to compete with a former employer." *Id., at *19* (citing *Trilogy Software, Inc. v. Callidus Software, Inc*, 143 S.W.2d 452, 467 (Tex. App.—Austin 2004, pet. denied).

In this case, there is a genuine factual dispute whether the customer lists constituted a trade secret. For example, Defendant testifies that he created the customer list himself through general knowledge, skills, and experience acquired during his employment at PLS. There are also fact issues as to whether he used the information in the customer lists while at GRTM. These questions of fact must be determined at trial. *See Tewari De-Ox Systems*, 637 F.3d at 613. The Court thus DENIES summary judgment on the Defend Trade Secrets Act and TUTSA claims.

### E.  Unfair Competition, Tortious Interference with Prospective Business, and Breach of Fiduciary Duty

Plaintiff notes that TUTSA contains a preemption provision that provides that the statute "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of trade secret." *DHI Grp., Inc. v. Kent*, 397 F.Supp.3d 904, 922 (S.D. Tex. 2019) (quoting Tex. Civ. Pr.& Rem. Code §134A.007(a)). The preemption provision has also been held to preempt claims of misappropriation of confidential information. *StoneCoat of Texas, LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 337 (E.D. Tex. 2019) (citing *Embarcadero Techs, Inc. v. Redgate Software, Inc,* 1:17-CV-444-RP, 2018 WL 315753 (W.D. Texas Jan 5, 2018)).

Defendant argues that Plaintiff's claims of unfair competition, tortious interference with prospective business, and breach of fiduciary duty each require proof that the Defendant "misappropriated" a trade secret or confidential, proprietary information.[1] Thus, Defendant asserts, they are preempted by TUTSA and should be dismissed.

First, with respect to the **unfair competition** claim, Plaintiff asserts in its Motion for Summary Judgment that Defendant "used" Plaintiff's "proprietary customer information," which constituted a "trade secret," by emailing "AJ Lifetime Numbers 8.14.19" to himself and later servicing six former PLS customers. (Doc. 53 at 29). Plaintiff then states that the action of "disclosing the secret" constituted a breach of confidence. (*Id.* at 30-31). Plaintiff claims that the breach of fiduciary duty of loyalty claim is not based on misappropriation, but instead on breach of confidence owed to an employer by an employee. To the contrary, however, Plaintiff explicitly premises its unfair competition claim on the same facts as its trade secrets claims.

Second, in alleging **tortious interference with prospective business**, Plaintiff argues that Defendant misappropriated a "product": the customer information on "AJ Lifetime Numbers 8.14.19," a "highly confidential" and "valuable, proprietary asset." (*Id.* at 33.) Plaintiff cites the same damage model of $925,663.04 in Defendant's gross sales to Plaintiff's customers. (*Id.* at 34). Defendant states that preemption should apply because these are the same facts Plaintiff uses for its TUTSA claim. *Welnfuse, LLC v. InfuseFlow, LLC,* 2021 WL 1165132 at *7 (N.D. Texas, March 26, 2011) (finding TUTSA preemption because allegation of tortious interference with existing contracts and prospective business relations relied on the same facts as the TUTSA claim). Plaintiff rebuts that the tortious interference with prospective business claim is not based

---

[1] Defendant argues the same for breach of the confidentiality provision. However, that claim relates to a particular provision in the Employment Agreement, regardless whether the information at issue constitutes a trade secret.

on misappropriation, but rather on interference with PLS's anticipated business to PLS's detriment for GRTM's benefit. Yet Plaintiff's own summary judgment brief, which relies on an allegation of misappropriation to fulfill the independent tort element, belies its counterargument.

Finally, in its claim for **breach of fiduciary duty of loyalty**, Plaintiff complains of the same email and uses the same sales to customers for its damage model. (Doc. 53 at 39-41.) Plaintiff argues that this claim is based not on misappropriation, but on Defendant's divulging information cultivated on company time for a competing business's benefit. (ECF 53, p. 29). This attempt to distinguish the factual basis for the claim is unavailing, as it still relies on the alleged use of the customer list.

Based on the above, the Court concludes that Plaintiff's unfair competition, tortious interference with prospective business, and breach of fiduciary duty claims are preempted under TUTSA. Thus, it GRANTS summary judgment to Defendant on these claims.

*     *     *

- Summary judgment is GRANTED in favor of Defendant on the following claims: violation of the Computer Fraud and Abuse Act, breach of the non-competition provisions, unfair competition, tortious interference with prospective business, and breach of fiduciary duty.

- Summary judgment is GRANTED in favor of Plaintiff on breach of the non-solicitation provision.

- Summary judgment is DENIED on all other claims, including breach of the confidentiality provision, breach of the return of materials provision, violation of the Defend Trade Secrets Act, and violation of the Texas Uniform Trade Secrets Act.

- Plaintiff is GRANTED leave to amend its Complaint, within five days of this Order, to add allegations relating to the return of materials.

  **IT IS SO ORDERED.**

  Signed at Houston, Texas on March 9, 2022.

  Keith P. Ellison
  United States District Judge