United States District Court
Southern District of Texas
**ENTERED**
June 30, 2022
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **PITTSBURGH LOGISTICS SYSTEMS, INC,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:20-CV-04282** |
| | § | |
| **ANDREW BARRICKS,** | § | |
| | § | |
| **Defendant.** | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Pittsburgh Logistics Systems, Inc. ("PLS" or "Plaintiff") brought the following claims against Defendant Andrew Barricks: (1) violation of the Computer Fraud and Abuse Act; (2) violation of the Defend Trade Secrets Act; (3) breach of contract as to the non-competition, non-solicitation, confidentiality, and return of materials provisions of the Employment Agreement between the parties; (4) misappropriation of trade secrets under the Texas Uniform Trade Secrets Act; (5) unfair competition; (6) tortious interference with contract; (7) tortious interference with prospective business; and (8) breach of fiduciary duty. (*See* Doc. 1 at 7-17.)

On March 9, 2022, the Court granted summary judgment to Defendant on the following claims: violation of the Computer Fraud and Abuse Act, breach of the non-competition provisions, unfair competition, tortious interference with prospective business, and breach of fiduciary duty. (Doc. 66 at 20.) The Court granted summary judgment in favor of Plaintiff on breach of the non-solicitation provision. (*Id.*)

The Court denied all other claims including violation of the Defend Trade Secrets Act, violation of the Texas Uniform Trade Secrets Act, breach of the confidentiality provision, and

breach of the return of materials provision. (*Id.*) The Court held a one-day bench trial on these claims on April 4, 2022.

The Court now submits the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## I.      LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides that, "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). In articulating findings of fact, Rule 52(a) "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Cent. Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (quoting *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652, 656 (5th Cir. 1996)). Instead, the rule is satisfied where the findings present the reviewer with "a clear understanding of the basis for the decision." *Id.* In accordance with Rule 52(a), this Memorandum and Opinion first lays out the Court's Findings of Fact followed by its Conclusions of Law.[1]

## II.     FINDINGS OF FACT

1.  PLS is a Pennsylvania company that offers services as a logistics broker. PLS provides third-party logistics services to a wide array of industries and coordinates the transportation of freight between its customers and carriers. It aims to obtain efficiencies and cost savings for customers. *See*, *e.g.*, Barricks Tr. Testimony, 14:18-20.

2.  Defendant Barricks was formerly employed by Plaintiff in Texas. He is a resident of Texas.

---

[1] To the extent any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law; and to the extent any Conclusion of Law reflects a factual finding, it shall to that extent be deemed a Finding of Fact.

**A.  Defendant's Employment**

3.  Defendant began his employment with PLS in June 2012. *Id.*, 9:14.

4.  The Employment Agreement between the parties included the following provisions, at

    issue in the trial:

> ***4. Confidentiality.*** *During the term of my employment with the Company and at all times thereafter, I shall not, directly or indirectly, divulge, furnish or make accessible to any other person, business, firm or corporation, or use in any way other than for the benefit of the business of the Company, any Confidential Information (as defined herein) which I have acquired or become acquainted with or will acquire or become acquainted with as a result of my employment with the Company, whether developed by me, or by others. For purposes of this Agreement: (a) Confidential Information shall mean any proprietary or confidential information of the Company, including but not limited to any trade secrets, confidential or secret designs, . . . processes, formulae, plans, manuals, . . . know-how, methods, compositions, ideas, improvements, financial and marketing information, costs, pricing, sales, sales volume, . . . customer and prospective customer lists, identity of any key personnel in the employ of customers and prospective customers, amount or kind of customer's purchases from the Company . . .*

> ***6. Return of Company Property and Records.*** *I shall, at the time of termination of employment for any reason, deliver to the Company any and* [sic] *property and Records in my possession, including, without limitation, all Developments, Records, Reports, Supplier Lists, Customer Lists, Confidential Information and reproduction of same, and I will not keep in my possession or recreate or deliver to anyone else copies of these items. I further agree that any property situated on the Company's premises and owned by the Company, including computers, disks and other storage media, filing cabinets and other work areas, is subject to inspection by Company personnel at any time with or without notice.*

> ***7. Non-Solicitation.*** *For a period of 2 years after the termination of my employment, for any reason, I agree not to directly or indirectly, anywhere in the United States, offer or attempt to offer any Prohibited Services (as defined herein) to any Restricted Customers (as defined herein) without first obtaining the Company's written approval. For purposes of this Agreement: (a) the term "Prohibited Services" means: (i) transportation management services, including outsourced transport, freight brokerage or logistics services, whether internet based or otherwise; (ii) developing and providing an e-commerce web site for providing logistic services for use by shippers or carriers; (iii) export and import services, including trans-border logistics, ocean container, break-bulk, and consulting; (iv) transportation related technical publications and services; (v) any other services that are the same as or similar to the services offered by*

*the Company; and (vi) any services that were not yet offered, but were being developed, by the Company within the last year prior to the termination of my employment with the Company; and (b) the term "Restricted Customers" means those customers that I have solicited or helped to solicit for the Company, or to which I have provided services or helped to provide services for the Company, as well as those customers about which I received confidential information during my employment with the Company that might be useful in making such a solicitation, whether they are the Company's current or former customers. In connection with this obligation, I expressly, and irrevocably, agree and represent that the scope of this nonsolicitation obligation, including the temporal, geographic, and activity scope, is neither onerous nor overly broad, and is, instead, both reasonable and necessary to protect the Company's legitimate business interests. With particular respect to the geographic scope of this non-solicitation obligation, I expressly, and irrevocably, agree and represent that a nationwide scope is reasonable and necessary because, inter alia, the customers with which I will interact, and about which I will obtain information, are located and do business throughout the United States. I further expressly, and irrevocably, agree and represent that: (a) I can, and will, seek written approval from the Company to offer Prohibited Services to a Restricted Customer whenever this nonsolicitation obligation creates, in my opinion, a restriction that is onerous or overly broad, or that is not reasonable and necessary to protect the Company's legitimate business interests; (b) such an approval process is a reasonable and appropriate method for me to seek such relief under such circumstances; and (c) my failure to seek such approval should be deemed to be an admission by me that the non-solicitation obligation is neither onerous nor overly broad, and is, instead, both reasonable and necessary to protect the Company's legitimate business interests . . .*

***9. Enforcement of Obligations.** Because of the Company's business, customers, market and sales territory are nationwide, and are not limited by state boundaries, and because the provisions of Sections 4, 7 and 8 of this Agreement are reasonable and necessary to protect and preserve the Company's goodwill, trade secrets, Confidential Information, and other legitimate business interests, and because damages for violations of such obligations are often difficult to immediately establish, I expressly, and irrevocably, agree and represent that the Company would be irreparably damaged if I were to breach my obligations under Section 4, 7 or 8 of this Agreement and that the Company is entitled to, and should be granted, injunctive and other relief by a court of competent jurisdiction upon such breach by me. I further expressly, and irrevocably, agree and represent that if such a court should ever determine that one or more of the provisions of Section 7 or 8 are unenforceable as written, then such provision shall be deemed to be reduced in scope or length, as the case may be, to the extent required to make such Section enforceable by said court, and that I waive any statutory or other right to argue that the Company may not recover damages suffered by it, either before or after the judicial reformation. I further expressly, and irrevocably, agree and represent that if I violate the provisions of Sections 7*

> *or 8 of this Agreement, then the periods described therein shall be extended by that number of days which equals the aggregate of all days during which any such violations occurred . . .*
>
> **12. Governing Law.** *This Agreement shall, in all respects, be governed by, construed and enforced in accordance with the laws of the State of Texas without regard to its conflicts of laws provisions. Jurisdiction and venue is specifically limited in any proceeding by the Company or Employee to enforce their rights hereunder to the state or federal courts that are geographically located in Harris County, Texas, and all parties hereto expressly agree that they are subject, and that they shall submit, to the jurisdiction of such courts, and that they hereby waive any and all grounds upon which to challenge the jurisdiction of such courts or the venue of such a proceeding.*

(Plaintiff's Tr. Exhibit 1, ¶¶ 4, 6, 7, 9).

5.  In January 2020, PLS required Defendant, who at the time was being paid both salary and commissions as Group Sales Manager, to choose only one form of compensation: salary as a manager or commissions as a salesperson. Defendant chose to retain commissions but resigned soon thereafter on April 9, 2020. *Id.*, 35:16-36:4.

6.  On April 9, 2020, Defendant submitted a notice of resignation to Plaintiff, effective immediately, but offering to "help with transitions" through April 14, 2020. Plaintiff's Tr. Exh. 2; *Id.*, 36:3-4. Mr. Barricks began working for a PLS competitor, Glen Rose Transportation Management, Inc. ("GRTM"), as a Sales Manager on April 10, 2020. Barricks Tr. Testimony, 9:8-11, 156:2-4.

**B.  Customer List**

7.  On April 9, 2020, Defendant emailed a customer list titled "AJ Lifetime Numbers 8.14.19" from his PLS email account to his personal email account. Barricks Tr. Testimony, 27:24-28:9,139:21-140:23; Plaintiff's Tr. Exh. 3. The Court finds the emailing of the customer list to be accidental because it was intended to transmit personal files only, as evidenced by the other 248 attachments, all of which were personal.

8.  Defendant created "AJ Lifetime Numbers 8.14.19" to monitor his sales performance. Barricks Tr. Testimony 140:1-15. Defendant did not create "AJ Lifetime Numbers 8.14.19" as a tool to sell to customers. *Id.*

9.  Defendant did not intend on leaving PLS at the time he created "AJ Lifetime Numbers 8.14.19". *Id.*, 144:8-10. He did not use the document to service customers while at PLS. *Id.*, 144:11-12.

### C.  Defendant's Sales and Use of Alleged Trade Secrets

10. Plaintiff alleges that Defendant misappropriated two trade secrets: (1) the customer list titled "AJ Lifetime Numbers 8.14.19," and (2) customer phone numbers that Defendant failed to delete from his cell phone. Feroce Tr. Testimony, 115:1-14.

11. Defendant did not use the customer list titled "AJ Lifetime Numbers 8.14.19" to conduct any business while at GRTM. Barricks Tr. Testimony, 49:9-12.

12. Defendant did not call any of Plaintiff's special vendors or suppliers while at GRTM. *Id.*, 49:6-8. Rather, Defendant found vendors and suppliers using Thomasnet, Hoovers, LinkedIn, and Google. *Id.*, 49:1-5.

13. Defendant did not rely on any of Plaintiff's lists to do business with Plaintiff's customers while at GRTM. *Id.*, 143:21-25. To determine what prices to charge customers, Defendant used public websites, primarily Internet Truckstop and DAT, which are available to anyone paying a subscription fee, and added an industry-standard fifteen percent markup. *Id.*, 141:24-142:14.

14. Plaintiff does not dispute Defendant's statement that he did not use Plaintiff's customer list while at GRTM. Feroce Tr. Testimony, 115:15-18.

15. Defendant deactivated applications on his cell phone that synced his PLS contacts to his

phone upon his resignation from PLS. Barricks Tr. Testimony, 44:12-45:12. However, he did not individually delete the contact information of former customers. *Id.*

16. While at GRTM, Defendant answered calls from customers he had serviced at PLS whose contact information remained on his cell phone. Feroce Tr. Testimony, 119:4-7.

17. Defendant did not initiate phone calls to Plaintiff's customers to solicit business from them after his resignation from PLS. Barricks Tr. Testimony, 42:8-11. Instead, six of Plaintiff's customers for which Defendant had served as a sales representative while at PLS called Defendant to request that he continue servicing their accounts as a GRTM employee. *Id.*, 42:8-22, 142:17-143:20; Feroce Tr. Testimony, 115:22-24.

18. These six customers, at issue in this lawsuit, are: Hillebrand (also known as Satellite Logistics Group); Novvi, LLC; Select Energy Services; Foeder Crafters of America; Professional Plastics; and Titan Containers. Defendant's father sits on the board of Professional Plastics and specifically sought a business relationship with his son. Barricks Tr. Testimony, 143:11-13 ("Q: If you didn't have these family contacts, would you have gotten the business? A: No, sir.").

19. Plaintiff's corporate representative admitted that, even if Defendant had not recorded the contact information for PLS customers on his phone, Defendant could have identified them through caller identification installed on his cell phone. Feroce Tr. Testimony, 120:4-9 ("Q: So he didn't even need to record those people's names in his cell phone for it to come up when they call, did he? A: No.").

20. Aside from Defendant's answering phone calls from (former) PLS customers, Plaintiff presented no evidence that Defendant used PLS's trade secrets in marketing, manufacturing, production, research, or development while at GRTM.

21. Defendant testified that, to sell to customers, he is personable, answers customers' phone calls promptly regardless of the time of the day, works hard, and treats his customers fairly. Barricks Tr. Testimony, 146:12-147:6.

22. Based on the above, the Court finds that Defendant used general "know how" to sell to customers at both PLS and GRTM.

### D.  Defendant's Commissions from Sales to PLS Customers

23. On sales to Plaintiff's customers while at GRTM, Defendant received compensation in the form of a commission of twelve percent of the net revenue earned by GRTM. Plaintiff's Tr. Exh. 5; Barricks Tr. Testimony, 134:19-138:10.

24. The gross revenues earned by GRTM on Defendant's sales to Plaintiff's customers while at GRTM were $925,663.04. Plaintiff's Tr. Exh. 9.

25. The net revenue, also known as gross margin, earned by GRTM on sales to Plaintiff's customers while at GRTM was $196,779.21. *Id.*

26. Defendant's net income from sales to Plaintiff's customers while at GRTM is calculated at twelve percent of GRTM's net revenues of $196,779.21, which equals $23,613.51.

### E.  Other Alleged Damages

27. Plaintiff's corporate representative admitted that Plaintiff's out-of-pocket expenses for the hiring and training of new managers would have been incurred after Defendant's resignation regardless of his alleged violations. Barricks Tr. Testimony, 124:2-125:7.

### F.  Injunctive Relief

28. Plaintiff sought injunctive relief for Defendant's alleged trade secret misappropriation and contract breaches in its Original Complaint. Doc. 1 at 17-21. But Plaintiff abandoned its request for injunctive relief as to the breach of contract claims in the First Amended

Complaint. *See generally* Doc. 67.

29. In its Proposed Findings of Fact and Conclusions of Law, Plaintiff acknowledges that "it did not pursue the injunction sought in its original complaint." Doc. 79 at 35.

30. Further, in the parties' Joint Pretrial Report, Plaintiff "note[d] that it [wa]s not seeking an injunction. Doc. 69 at 9.

31. Plaintiff made no mention of seeking an injunction at trial.

### G.  Return of Company Information

32. Plaintiff first pleaded its claim for breach of the return of materials provision on March 14, 2022, through its First Amended Complaint. Doc. 67 at ¶¶ 39-47.

33. Defendant notified Plaintiff that all confidential information of Plaintiff had been destroyed on or before March 14, 2022. Plaintiff's Tr. Exh. 24.

34. Plaintiff did not file any motions or submit any discovery regarding the return of company property during the pendency of this case.

## III.    CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

35. This Court has jurisdiction over the Parties pursuant to 28 U.S.C. § 1332(a), as there is complete diversity between the Parties, and the amount in controversy is greater than $75,000.00. Plaintiff maintains its principal place of business in the Commonwealth of Pennsylvania, and Defendant is a resident of Texas.

36. Further, this Court has original jurisdiction since the claims in this case rest in part on a federal question under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

37. This action also arises under the laws of the State of Texas, as Defendant was employed in Texas, and the Employment Agreement between the parties makes Texas law

applicable.

38. Venue is proper in this Court because a substantial part of the events or omissions giving rise to PLS's claims occurred throughout Texas, including Harris County, and there is an agreement between the parties making venue proper in Harris County, Texas. 28 U.S.C. § 1391(b)(2).

**B. Plaintiff Has Not Shown that Defendant Misappropriated Any Trade Secrets Under DTSA or TUTSA**

39. To prevail on its claim for trade secret misappropriation under the Texas Uniform Trade Secrets Act ("TUTSA") or the federal Defend Trade Secrets Act ("DTSA"), PLS must establish (1) the existence of a trade secret and (2) misappropriation by Defendant. Tex. Civ. Prac. & Rem. Code §§ 134A.002-134A.003; 18 U.S.C. § 1831 et seq.; *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 702 (W.D. Tex. 2019).

40. The TUTSA defines a "trade secret" as information, including any design, pattern, or plan, where:

   1. the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

   2. the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code § 134A.002(6); 18 U.S.C. § 1839(3); *Miner*, 383 F. Supp. 3d at 702 (noting that definitions in TUTSA are "identical" to those in the DTSA); *see also Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1021 (E.D. Cal.

2011) ("information is not necessarily a trade secret simply because it is known by one party and not by the other.").

41. Whether a trade secret exists is a question of fact. *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 874 (5th Cir. 2013).

### *1. PLS Has Established That the Customer List is a Trade Secret*

42. Plaintiff produced evidence at trial that Defendant had accidentally emailed himself a customer list titled "AJ Lifetime Numbers 8.14.19." The list contained 259 names of customers that the Defendant had serviced while employed by Plaintiff. The list also contained such information as total revenues on sales, total costs on sales, and profit margins. Plaintiff's Tr. Exh. 5.

43. "A customer list may be a trade secret, but not all customer lists are trade secrets under Texas law." *Guy Carpenter & Co., Inc. v Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003) (citing *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 766 (Tex. 1958)). "Texas courts consistently consider three factors when determining whether a customer list is a trade secret: (1) what steps, if any, an employer has taken to maintain the confidentiality of a customer list; (2) whether a departing employee acknowledges that the customer list is confidential; and (3) whether the content of the list is readily ascertainable." *Id.* at 766.

44. First, Plaintiff presented evidence that it took steps to maintain the confidentiality of the customer information at issue by having the Defendant sign an Employment Agreement defining the information as confidential. Plaintiff's Tr. Exh. 1 at ¶ 4.

45. As to the second factor, Defendant only partially agreed that the customer list in question was confidential. Defendant testified that pricing and sales information was not confidential. Barricks Tr. Testimony, 30:9-11. He explained that he determined pricing

information by referencing two main websites: Internet Truckstop and DAT, which are widely used in the logistics industry and can be accessed by anyone paying a subscription fee. *Id.*, 141:24-142:14. Nonetheless, the Court concludes that the second element has been met because Defendant at least partially agrees that the customer list contained confidential information.

46. Third, some of the information in the customer list is not readily ascertainable. PLS does not publish its customer names, which are not otherwise publicly available. Information about those customers, such as load information, is only accessible through PLS-issued logins. Feroce Tr. Testimony, 95:4–11 (describing how load information is only accessible through PLS-issued logins). *See also* Barricks Tr. Testimony, 15:15–16:4 (describing creating the spreadsheet from PLS's internal information from its internal database); Feroce Tr. Testimony, 111:3–8 (describing PLS Pro, a proprietary software to house company and customer information), 111:13–15 ("Q. [D]oes anyone outside of PLS have access to any of these systems? A. No.")).

47. Thus, the Court concludes that the customer list "AJ Lifetime Numbers 8.14.19" constituted a trade secret.

### 2. *PLS Has Not Shown That Defendant Misappropriated the Customer List*

48. Courts have held that both the TUTSA and DTSA require "use" of the trade secret for a defendant to be liable. In *M-1, LLC,* the court found that both statutes require "use" of the alleged trade secret. *M-I L.L.C. v. Q'Max Sols., Inc.*, No. CV H-18-1099, 2019 WL 3565104, at *4 (S.D. Tex. Aug. 6, 2019) (cited in both parties' Proposed Findings of Fact and Conclusions of Law); *see also* StoneCoat of Texas, LLC v. ProCal Stone Design, LLC, 426 F. Supp. 3d 311, 340 (E.D. Tex. 2019) (assuming "use" as an essential element

of plaintiff's trade secret misappropriation claim under TUTSA).

49. The Fifth Circuit has outlined the definition of "use" of a trade secret as follows:

> *As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use[.]" . . . Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute "use."*

*Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 877 (5th Cir. 2013) (citations omitted).

50. Plaintiff has not presented sufficient evidence that Defendant used Plaintiff's customer list in marketing, manufacturing, production, research, or development while at GRTM. Rather, Plaintiff's case appears to rest solely on its allegation that Defendant used the customer list to solicit Plaintiff's customers.

51. However, Plaintiff has not proven that Defendant used the customer list to conduct business at GRTM. Defendant testified that he did not call any of Plaintiff's special vendors, suppliers, or "anything like that" while at GRTM. Barricks Tr. Testimony, ECF 76, 49:6-8. Defendant further testified that he did not rely on any of Plaintiff's "lists" to do business with PLS customers. *Id.* 143:21-25. Defendant provided a substantive and credible explanation of how he was able to sell to PLS's customers while employed at GRTM without using the customer list in question, including determining pricing by referencing two public websites and adding a standard markup.

52. Plaintiff failed to question or dispute Defendant's account, whether through cross-examination or Plaintiff's corporate representative, Mr. Feroce. When Feroce was asked if he knew whether Defendant used the customer list in question while at GRTM, Mr. Feroce testified that he did not. Feroce Tr. Testimony, 115:15-18. When pressed further, he admitted that he had no reason to dispute Defendant's assertion that Defendant did not

Case 4:20-cv-04282   Document 80   Filed on 06/30/22 in TXSD   Page 14 of 19

use Plaintiff's trade secrets while at GRTM. *Id.*, 117:18-119:21. Mr. Feroce, who was also a salesperson with PLS, *id.*, 114:20-21, pointed to no sales process different from the one Defendant described.

53. Accordingly, even though the customer list constituted a trade secret, Plaintiff has failed to show that Defendant misappropriated that trade secret.

### 3.  *PLS Has Not Established That Customer Phone Numbers Are a Trade Secret*

54. Defendant deactivated applications that synced PLS contacts to his phone but failed to erase customer phone numbers that were individually recorded in the device. Plaintiff contends that Plaintiff's answering the calls of PLS customers whose phone numbers were saved in his phone constituted "use" of Plaintiff's trade secret information.

55. However, Mr. Feroce admitted that Defendant could have identified the customers with caller identification. Even if Defendant did not have caller identification installed in his phone, he could have identified the customers by simply answering and asking who was calling, or by searching for company contacts on public search engines.

56. The Court therefore concludes that the customer contact information that was recorded in Defendant's phone did not constitute a trade secret. Even if it were a trade secret, Plaintiff has failed to show that Defendant "used" that information for the purposes of its misappropriation claim, since there is no evidence that Plaintiff initiated any solicitation calls to PLS customers while at GRTM.

### 4.  *PLS Is Not Entitled to Misappropriated-Related Damages or Injunctive Relief*

57. For the foregoing reasons, the Court concludes that PLS has failed to establish liability for trade secret misappropriation. Thus, PLS is not entitled to damages or injunctive relief as a matter of law.

14 / 19

### C. Plaintiff Is Entitled to Damages, But Not Injunctive Relief, for Defendant's Breach of the Non-Solicitation Provision

58. The Court granted summary judgment to Plaintiff on its claim that Defendant breached the non-solicitation provisions of the Employment Agreement, which the Court found to be enforceable. Doc. 66 at 15. Prior to trial, however, the Court had not determined the damages, if any, to which Plaintiff is entitled. It now does so here.

59. The Court has previously concluded that "the non-solicitation terms constitute a restraint on trade governed by the [Texas Covenant Not to Compete Act, or] CNCA." Doc. 66 at 11. The CNCA preempts the remedies available for breach of contract. *Glattly v Air Starter Components, Inc.,* 332 S.W.3d 620, 645 (Tex.App.—Houston [1st] 2010, pet. denied). The CNCA does not allow for the recovery of attorneys' fees to a party seeking to enforce a provision governed by the Act. *Id.* at 645 (noting that the CNCA "only provides for an award of attorney's fees to an employee in limited circumstances; it makes no provision for an award of fees to an employer") (citing Tex. Bus. & Com. Code Ann. §15.51(c)). Thus, Plaintiff cannot recover attorneys' fees for Defendant's violation of the non-solicitation provisions.

60. Neither could Plaintiff recover exemplary damages, as the CNCA provides only for actual damages. Tex. Bus. & Com. Code Ann. §15.51. Moreover, the underlying duty not to solicit was formed through contract, and Defendant's alleged violation of that duty was pled as a breach of contract. Exemplary damages are not available for breach of contract. *See Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 72 (Tex. 1997).

61. "In contract law, theories of recovery for a breach of contract include reliance or expectancy damages. Reliance damages, similar to out-of-pocket recovery, reimburse one for expenditures made towards the execution of the contract in order to restore the *status*

*quo* before the contract. Expectancy damages, similar to benefit-of-the-bargain recoveries, award damages for the reasonably expected value of the contract. Thus, the theories of recovery for both tortious misrepresentation and breach of contract are similar and necessarily involve the same type of damages." *Mays v Pierce*, 203 S.W.3d 564 (Tex.App.—Houston [14th] 2006) (quoting *Hart v. Moore*, 952 S.W.2d 90, 97 (Tex.App.—Amarillo 1997, pet. denied).).

62. As to reliance damages, Plaintiff attempted to present evidence of out-of-pocket expenses resulting from Defendant's breach of the non-solicitation provision. However, even Plaintiff's corporate representative acknowledges that these expenses were not incurred due to Defendant's alleged violations; to the contrary, Plaintiff would have inevitably incurred them after Mr. Barricks' resignation. 124:2-125:7.

63. However, Defendant concedes that Plaintiff could seek expectation damages for Defendant's breach of the non-solicitation provision. The Court measures these damages based on net profits. *See Kellmann v Workstation Intergrations, Inc.,* 332 S.W.3d 679 (Tex.App.—Houston [14th] 2010) (holding that the calculation of lost profit damages "must be based on net profits, not gross revenue or gross profits") (citations omitted). The Court concludes that Defendant's net profits from sales to Plaintiff's customers while at GRTM were $23,613.51, or twelve percent of GRTM's net revenues from Defendant's sales to Plaintiff's customers ($196,779.21). Plaintiff's Tr. Exhs. 5, 9; Barricks Tr. Testimony, 134:19-138:10.

64. Thus, Plaintiff is entitled to actual damages of $23,613.51 for Defendant's breach of the non-solicitation provisions.

### 1. *Injunctive Relief*

65. Plaintiff did not plead for injunctive relief as to the claim for breach of the non-solicitation provisions. *See generally* Doc. 67, First Amended Complaint. Indeed, Plaintiff acknowledges in its Proposed Findings of Fact and Conclusions of Law that "it did not pursue the injunction sought in its original complaint."[2] Doc. 79 at 35. In addition, Plaintiff noted in the Joint Pretrial Report that it was not seeking injunctive relief. Doc. 69 at 9. Finally, Plaintiff made no mention of seeking an injunction as to its breach of contract claims at trial. To the extent that Plaintiff now seeks an injunction relating to the non-solicitation provisions, it cannot do so because it has abandoned that request.

66. Even if Plaintiff had maintained a request for injunctive relief as to the non-solicitation provisions, it has failed to set forth an appropriate injunction. Injunctions must be specific, set forth the reasons for its issuance, and describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; it cannot be so broad as to enjoin a defendant from activities that are a lawful and proper exercise of his rights. *Webb v. Glenbrook Owners Ass'n, Inc*., 298 S.W.3d 374, 384 (Tex.App.—Dallas 2009). Here, Defendant has failed to specifically identify how many days, and for which customers, the Employment Agreement's tolling provisions should extend the terms of the otherwise expired non-solicitation provisions. Plaintiff did not specify the aggregate number of days for the relevant customers during which Defendant was noncompliant.

67. The Court thus concludes that Defendant is not entitled to injunctive relief as to

---

[2] Plaintiff acknowledges this fact to support its argument that Defendant is not entitled to attorneys' fees for defending against Plaintiff's unavailing claim for breach of the non-compete provisions (discussed further in Sec. III.D.). The Court applies this concession to the non-solicitation provision, which is also governed by the CNCA.

Defendant's breach of the non-solicitation provisions.

**D.  Defendant Is Not Entitled to Attorneys' Fees for Defending Against Plaintiff's Claim for Breach of the Non-Compete Provision**

68. The Court previously granted summary judgment to Defendant on the breach of contract cause of action as to alleged breach of the non-competition provisions. Doc. 66 at 13. The Court concluded that the non-competition terms in the Employment Agreement are unreasonable in scope, as they amount to an industry wide exclusion from subsequent employment, in violation of the CNCA. Defendant now seeks attorneys' fees pursuant to Tex. Bus. & Com. Code Ann. §15.51(c) for successfully defending against Plaintiff's claim.

69. Attorneys' fees awards are discretionary under the CNCA. *See* Tex. Bus. & Com. Code Ann. §15.51(c) ("[T]he court <u>may</u> award the promisor the costs, including reasonable attorney's fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant.") (emphasis added). The Court finds that Plaintiff did not bring its claim for breach of the non-competition provision in bad faith and that Plaintiff presented reasonable (though ultimately unavailing) arguments on its enforceability. Further, Plaintiff prevailed on another breach of contract claim, as to the non-solicitation provisions, which is also governed by the CNCA.

70. The Court therefore declines to award attorneys' fees to Plaintiff on the claim for breach of the non-competition provisions.

**E.  Defendant Is Not Entitled to Relief on Its Remaining Breach of Contract Claims**

71. The Court concludes that Defendant did not breach the Employment Agreement's confidentiality provisions. As the Court concluded above, Plaintiff has failed to establish that Defendant divulged or used the customer list, customer phone numbers saved on his

phone, or any other allegedly confidential information.

72. On the other hand, the Court concludes that Defendant breached the Employment Agreement provision requiring the return of company property and records. Defendant possessed a customer list at the time of his separation that he failed to return to Plaintiff until March 14, 2022. Nonetheless, Plaintiff cannot recover on this claim because it has presented no evidence of damages related to Defendant's failure to return.

## IV.    CONCLUSION

73. Plaintiff's claims under the TUTSA and the DTSA are **DENIED**.

74. Defendant is **ORDERED** to pay damages of $23,613.51 to Plaintiff for his breach of the non-solicitation provisions. Plaintiff is not entitled to injunctive relief on this claim.

75. The Court **DECLINES** to award attorneys' fees to Defendant for defending against the claim for breach of the non-competition provisions.

76. Plaintiff's claim for breach of the confidentiality provisions is **DENIED**.

77. Relief for Defendant's breach of the provision on return of materials is **DENIED.**

   **IT IS SO ORDERED.**

  Signed at Houston, Texas on June 30, 2022.

Keith P. Ellison
United States District Judge